2023 IL App (4th) 230165

NO. 4-23-0165

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 27, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| NATALIE URSO, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Peoria County |
| BRADLEY UNIVERSITY, | ) | No. 18L116 |
|     Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Frank W. Ierulli, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Turner and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1  In April 2018, plaintiff, Natalie Urso, initiated an action for breach of contract against defendant, Bradley University (Bradley), after Bradley prohibited Urso from continuing in its nursing program. After the parties filed cross-motions for summary judgment, the trial court denied Urso's motion and granted summary judgment in favor of Bradley. Urso appeals, arguing that there is no genuine issue of material fact that her removal from Bradley's nursing program was arbitrary, capricious, and in bad faith. We affirm.

¶ 2          I. BACKGROUND

¶ 3  The following facts are taken from the record, including depositions attached to the cross-motions for summary judgment. We will supplement the facts as necessary in our analysis. Located in Peoria, Illinois, Bradley is an institution of higher learning that provides, among other

things, undergraduate education for students in its nursing program. In August 2017, Urso was a student in Bradley's nursing program.

¶ 4                A. Bradley's Department of Nursing Policies

¶ 5       At the time Urso was a student, Bradley's Department of Nursing maintained an Undergraduate Student Handbook (Nursing Handbook) which communicated to nursing students, *inter alia*, the department's expectations and policies. The following provisions were contained in the "Academic Progression" section of the Nursing Handbook:

> "INDIVIDUAL COURSE GRADE REQUIREMENTS
>
> Students must earn a grade of "C" or better in every required nursing course in order to progress in the nursing program. A student must earn a "C" or better in the cumulative score of exams in NUR 200, 204, 206, 303, 306, 308, 314, 316, 318, 404, 408, 410, 414, 418 [*sic*] to pass the course.
>
> A student that is not successful in any required nursing course *may not progress* to the next semester in the nursing program of study. The student must petition to repeat the course and reenter the nursing sequence. \*\*\*
>
> REPEATING OR RE-ENROLLING IN A NURSING COURSE
>
> *A student is permitted to reenroll or repeat a nursing course only once per academic career.* If a student fails a required nursing course at Bradley University, the student may not take an equivalent course at another university and transfer that course to Bradley University for credit." (Emphases in original.)

Per the foregoing policy, students who failed two nursing courses were not permitted to continue in Bradley's nursing program. On some occasions, the Department of Nursing had employed an unwritten exception to this policy. Those occasions involved a student failing two courses in a

single term and extenuating circumstances, such as documented illnesses throughout the semester or family issues.

¶ 6　　　　　The Nursing Handbook indicated that practicum courses were graded on a satisfactory/unsatisfactory scale. The "Clinical Practicum" section of the Nursing Handbook set out the expectations and policies related to practicum courses, including the attendance policy, required equipment for the practicum, and the use-of-technology policy. The "Clinical Practicum" section also contained the following provisions:

"UNSAFE PRACTICE

The faculty of the Department of Nursing has an ethical, academic, and legal responsibility to prepare competent professional nurses.

Unsafe practice is defined as an act or behavior which threatens or has the potential to threaten the physical, emotional, mental, or environmental safety of the client, a family member or substitute familial person, another student, a faculty member, or other members of the health care team.

Guidelines for safe practice include, but are not limited to:

1) The Illinois Nurse Practice Act

2) The American Nurses' Association Code of Ethics

3) Standards of care developed by regulatory and accrediting bodies, health care institutions, nursing organizations, and other expert sources.

Unsafe practice includes, but is not limited to:

1) nursing practice for which a student is not authorized or educated to perform at the time of the incident

2) attendance at the clinical site under the influence of alcohol and/or drugs (illicit and/or prescription) that would impair judgment.

3) falsification of verbal report or written/electronic documents[.]"

This section also noted that, if an unsafe practice was observed, the "appropriate faculty members" would meet, "come to a decision," and notify the student of the decision. The Nursing Handbook further provided:

"Decisions are based on [the] scope and severity of the incident and may include (but not limited to) the following actions:

1) Formal written reprimand to be included in student's permanent file

2) Remedial work to be completed by the student

3) Failure in practicum

4) Dismissal from the nursing program

Dismissal from the nursing program does not constitute dismissal from the University. A student who is not in agreement with the decision of the faculty has the option of pursuing the issue within the framework of the Bradley University Student Grievance Committee Operating Procedure [(Student Grievance Procedure)]."

The decision regarding what course of action to take in response to an incident involving an unsafe practice was discretionary, based upon the severity of the incident.

¶ 7                                        B. Bradley's Student Grievance Process

¶ 8             The Student Grievance Procedure was contained in Bradley's Student Handbook and outlined the following. A student academic grievance was defined as a case where a student claimed "unfair, prejudicial, or capricious evaluation or treatment of an academic nature by a

[Bradley] faculty member." Resolution of such a grievance first required a student to undergo an "informal" procedure before proceeding to a "formal" procedure. Times listed in these procedures were deemed "recommended guidelines."

¶ 9 During the informal procedure, a student was required to meet with the faculty member to attempt to resolve an issue. If the issue remained unresolved after that meeting, the student, within five days of the faculty member's decision, could "appeal to the chairperson/director of the University faculty member's department/division," who would render a "written decision upholding or rejecting the appeal" within five working days of the appeal. If the student or faculty member was unsatisfied with the result, the aggrieved party could "appeal the decision of the chairperson/director to the Dean(s) of the College(s) in which the given academic concern resides." Within five working days, the dean or the dean's designee was to meet with the parties. Within five days of the conclusion of the meeting, the dean or the dean's designee was to deliver a written decision upholding or rejecting the appeal.

¶ 10 If, after that informal process, the issue remained unresolved, the student or faculty member could initiate the formal phase of the grievance procedure by appealing to the chairperson of the University Student Grievance Committee (Committee) in writing. The chairperson would then obtain written statements from the parties in the appeal, and the Committee would then meet to decide whether a grievance was "in order." If the Committee found that a grievance was in order, the Student Grievance Procedure provided the following:

"[T]he Committee shall:

1) Determine a date, time and place for a formal hearing. Determine the procedures for conducting the formal hearing. All parties concerned will be given at

least five working days [*sic*] notice of the time, date and place of the hearing, and of the procedures.

2) Call on other faculty, staff and students if it would serve the purposes of due process.

3) Retain records of all written matters dealing with each case."

The Committee was to submit its written findings and decisions for review to the provost within 45 working days after the matter was submitted to the Committee. Finally, within 30 days of receiving the Committee's findings and recommendations, the provost was to notify the parties of "his/her agreement or disagreement with the Committee's decision, stating the reasons in writing."

¶ 11                              C. Events Giving Rise to This Appeal

¶ 12            During Urso's 2016 spring semester, she was enrolled in NUR 206: Adult Health I and received the grade of "D." As a result, Urso reenrolled in the course during the summer session, and she received the grade of "C." In Urso's 2017 spring semester, she was enrolled in, *inter alia*, NUR 317, Adult Health II - Practicum.

¶ 13            On March 20, 2017, as part of her NUR 317 practicum curriculum, Urso attended a clinical at OSF Saint Francis Medical Center in Peoria. The preceptor nurse for Urso's primary patient was Holly Phillips. It was Phillips's first day of orientation for her job. That morning, Urso informed Phillips that Urso would be taking the patient's vital signs and conducting other duties until 2 p.m.

¶ 14            At approximately 9:55 a.m., Urso went to her primary patient's room to take his vital signs and observed Phillips leaving the room with the vitals cart. Phillips informed Urso that she had just completed the patient's vitals. Urso did not record any vitals for her primary patient at that time. Instead, Urso left and gave medication to her secondary patient. At 10:16 a.m., Urso

entered the vitals that Phillips had charted at 9:55 a.m. When Phillips discovered this, she informed Urso's clinical instructor, Assistant Professor Laura Wallenfang. Wallenfang subsequently asked Urso about her entry, and Urso acknowledged that she had not personally taken the patient's vital signs that she recorded at 10:16 a.m. and had entered the vitals that Phillips had taken at 9:55 a.m. Wallenfang wrote in her clinical anecdotal note for March 20, 2017, that she explained to Urso that the patient could have been in severe hypotension at 10:16 a.m., and the vitals Urso had entered did not accurately reflect the patient's true state at that time.

¶ 15    Thereafter, Wallenfang met with Deborah Daniels, the course coordinator for NUR 317, to inform her that Urso had falsified a medical record. Daniels responded that this constituted an unsafe practice and that, because Urso did not meet the required practicum expectations, she would need to receive a failing grade of "Unsatisfactory" in the course, which was graded on a satisfactory/unsatisfactory scale. The record contains no indication that Urso's patient was, in fact, harmed by her actions on March 20, 2017. During Daniels's deposition, however, Daniels explained that, by falsifying the patient's vitals, Urso put the patient at risk because "if that client's vital signs were not stable as they had been 40 minutes earlier, that would not have been caught and it would have looked to any other provider or healthcare worker that that client was stable, when in fact they might not have been."

¶ 16    On March 22, 2017, Wallenfang e-mailed Urso, requesting a meeting to discuss Urso's clinical performance. Urso agreed, and on March 23, 2017, she met with Wallenfang and Dr. Peggy Flannigan, the associate chairperson of the Department of Nursing. At the meeting, Wallenfang gave Urso a copy of her final evaluation of Urso's performance in NUR 317. The evaluation indicated that Urso received a grade of "Unsatisfactory." The evaluation explained that Urso "did not meet the critical behavior of safe practice which is required to successfully complete

the course" because she admitted that she had not completed her own vitals on her patient but had copied her primary nurse's vitals taken at 9:55 a.m. and entered them at 10:16 a.m. The evaluation deemed Urso's act a falsification of her documentation. Urso was informed that, because the "Unsatisfactory" grade constituted a failure, and because this was her second failing grade, she would be dismissed from the nursing program. Wallenfang and Dr. Flannigan asked Urso to sign the evaluation, which would have indicated that Urso read it, but Urso refused to do so.

¶ 17        Unsatisfied with this outcome, Urso and her mother met with other faculty members in the Department of Nursing, which did not lead to a resolution satisfactory to Urso. On March 24, 2017, Urso asked Wallenfang, via e-mail, to meet with her and her mother. Wallenfang declined.

¶ 18        On March 27, 2017, Urso and her mother met with Dr. Flannigan and Dr. Cindy Brubaker—the chair of the Department of Nursing—pursuant to the second stage of the informal Student Grievance Procedure. At the meeting, Urso provided a packet of documents labeled "Academic Grievance Supporting Documents." Among the documents was Urso's written account of the events of March 20, 2017. In that document, Urso claimed that she was about to take her patient's vitals at 9:55 a.m. but learned that Phillips had already taken them, even though Urso had told Phillips that she would record them. Urso's account continued, "I told [Phillips] that if it's okay with her, I'll just go ahead and include her vitals in my report." Urso claimed that she did not want Phillips to get angry for reassessing the patient's vitals after Phillips had just done so, and she did not want to make the patient go through the "ordeal" of having his vitals immediately reassessed. Urso recounted that, after attending to her secondary patient, "I recorded the 9:55 am vitals that [Phillips] had taken at approximately 10:16 a.m.," but by doing so, she was "in no way

trying to misrepresent the fact that I was not the person who took the vitals." Urso requested a grade change, but Dr. Brubaker stated that she could not do that, and the meeting concluded.

¶ 19 Per the third stage of the Student Grievance Procedure, Urso and her mother—also on March 27, 2017—met with Dean Joan Sattler and Interim Associate Dean Kara Wolfe, but this meeting also did not lead to a conclusion that was satisfactory to Urso.

¶ 20 On March 30, 2017, Dr. Brubaker informed Urso, via letter, of her decision to uphold Urso's failing grade in NUR 317. Dr. Brubaker explained that she reviewed documents relevant to Urso's academic grievance, including Urso's written account of the events, Wallenfang's evaluation, and content from prior courses establishing that Urso had been taught about the legal guidelines for documentation. Dr. Brubaker explained that Urso's act of copying vital signs that were previously taken by her primary nurse and documenting them as her own constituted an unsafe practice according to the Nursing Handbook. She further explained that, since Urso had previously failed and repeated NUR 206, she would not be allowed to repeat NUR 317, and therefore, she would not be allowed to continue in the nursing program under the terms of the Nursing Handbook.

¶ 21 On April 6, 2017, Dean Sattler and Interim Associate Dean Wolfe officially informed Urso, via e-mail, of their decision to uphold Urso's failing grade in NUR 317. They indicated that they read the documents related to Urso's academic grievance, which did not support Urso's claims that Phillips gave her a patient's vitals to chart as her own and that Urso thought this was permissible.

¶ 22 On April 9, 2017, Urso initiated the formal portion of the Student Grievance Procedure via an e-mail to the chair of the committee. In her e-mail, Urso asserted that her "instructor's accusations have no merit" because she had "no intent to deceive *** and absolutely

no falsification of records occurred." Urso claimed that her reputation had been defamed as a result of the accusations. She further noted that she had never received a recording or transcript during the informal portion of the Student Grievance Procedure. On that point, Urso referenced the " 'Grievance Procedure' " section of the "2016-17 Undergraduate Catalog":

> " 'Due process requirements for a fair hearing shall be provided to all parties. The record of the hearing before the Dean or the Dean's designee(s) shall consist of written statements of the instructor and student in support of their positions prior to the hearing and a tape recording or transcript of the hearing itself.' "

However, the quoted provision appeared in the portion of the Undergraduate Catalog that applied to the grievance procedure for breaches of academic integrity (*i.e.*, when a student was accused of engaging in bribes, favors, or threats to influence or tamper with a grade), not the Student Grievance Procedure applicable to a student's academic grievance, as outlined above (*i.e.*, when a student alleged unfair, prejudicial, or capricious evaluation by a faculty member).

¶ 23        On May 3, 2017, the chair of the committee, Kelly Roos, informed Urso via e-mail that a formal hearing would take place on May 11, 2017. Roos attached to the e-mail a document detailing the procedure to be followed during the hearing, as well as a link to the Committee's Student Grievance Procedure. Per the document outlining the hearing procedure, Urso and Wallenfang, separately, would be given an opportunity to make a statement before being questioned by the Committee, then the Committee would decide if further questioning of the parties or witnesses would be necessary.

¶ 24        On May 11, 2017, the hearing occurred. No transcript of the hearing was made, though the record indicates that witnesses included Wallenfang, Dr. Brubaker, and Daniels. The witnesses informed the Committee that Urso had falsified the vital signs of her patient, which

caused Urso to receive a failing grade in the course. The witnesses informed the Committee that Urso's act constituted an unsafe practice that endangered the health of the patient, though no explanation was given at that time as to why the act endangered the patient. The Committee was also informed that there had been previous instances of students in the practicum who had falsified written records with information that had not been measured by them. In those cases, the students received failing grades.

¶ 25        On May 12, 2017, the Committee informed Provost Walter Zakahi in writing that it unanimously recommended that Urso's failing grade in NUR 317 should stand. The Committee determined that Urso did not deny recording vitals she had not measured and that—even if she did not intend to deceive, defraud, or harm anyone—"the ethical standards becoming of a nurse were violated," as asserted by Wallenfang and other witnesses. The Committee further noted that the issuance of a failing grade for the practicum course was the consequence in prior instances of students falsifying medical documentations and, therefore, "there is a clear precedent in the Bradley nursing department for assigning a failing grade in this situation." The Committee thus concluded that Urso's failing grade in NUR 317 should stand and recognized that Urso "will now not be allowed to continue in the nursing program at Bradley."

¶ 26        On May 23, 2017, Zakahi issued his written decision to Urso, accompanied by a copy of the Committee's letter outlining its decision. Zakahi notified Urso that he was "in agreement with the recommendation of the committee" that her failing grade should stand and that, as a result, she would not be allowed to continue in the nursing program.

¶ 27                    D. The Underlying Proceedings

¶ 28        On April 30, 2018, Urso initiated an action in the circuit court, alleging breach of contract. Specifically, Urso contended that Bradley failed to follow the policies outlined in its

handbooks, and it failed to perform its contractual duties and obligations in good faith in discharging her from the nursing program.

¶ 29 The parties filed cross-motions for summary judgment. Following a hearing on the motions on January 18, 2023, the trial court granted Bradley's motion for summary judgment and denied Urso's motion for summary judgment.

¶ 30 This appeal followed.

¶ 31 II. ANALYSIS

¶ 32 On appeal, Urso argues that the trial court erred in denying her motion for summary judgment and granting Bradley's motion for summary judgment on her breach of contract claim. Urso argues that there is no genuine issue of material fact that Bradley's decision to remove her from its nursing program violated its undergraduate nursing handbook and was arbitrary, capricious, and in bad faith.

¶ 33 This court reviews summary judgment orders *de novo*. *Seitz-Partridge v. Loyola University of Chicago*, 2013 IL App (1st) 113409, ¶ 16. Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). When ruling on a motion for summary judgment, a court must consider the pleadings, depositions, and affidavits strictly against the movant and in favor of the nonmoving party. *Courson v. Danville School District No. 118*, 301 Ill. App. 3d 752, 755 (1998). The purpose of summary judgment is not to try a question of fact but to determine whether a question of fact exists that would preclude the entry of a judgment as a matter of law. *Seitz-Partridge*, 2013 IL App (1st) 113409, ¶ 20. Accordingly, a nonmoving party need not prove his or her case in response to a motion for summary judgment but must present a factual

basis that would arguably entitle that party to judgment. *Seitz-Partridge*, 2013 IL App (1st) 113409, ¶ 20. When parties file cross-motions for summary judgment, they agree that only questions of law are involved and invite the court to decide the issues based on the record. *Sheckler v. Auto-Owners Insurance Co.*, 2022 IL 128012, ¶ 29.

¶ 34        "It is true that a college or university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins ***." *Raethz v. Aurora University*, 346 Ill. App. 3d 728, 732 (2004). Despite this, the relationship between a private university and a student "is unique and cannot be strictly categorized or characterized in purely contractual terms." *Raethz*, 346 Ill. App. 3d at 732. Courts are reluctant to interfere with the academic affairs and regulation of student conduct in a private university setting. *Raethz*, 346 Ill. App. 3d at 732; see *Frederick v. Northwestern University Dental School*, 247 Ill. App. 3d 464, 469 (1993) ("Courts have been loathe to review, much less overturn, academic dismissals."). Accordingly, in the student-university context, a student may have a remedy for breach of contract when it is alleged that an adverse academic decision was made concerning the student "but *only* if that decision was made *arbitrarily*, *capriciously*, *or in bad faith*." (Emphases in original.) *Raethz*, 346 Ill. App. 3d at 732.

¶ 35        Establishing arbitrary or capricious conduct is a heavy burden. *Raethz*, 346 Ill. App. 3d at 732. A plaintiff arguing that she was improperly dismissed must show that her dismissal was without any discernible rational basis. *Raethz*, 346 Ill. App. 3d at 732. Thus, "a court may not override the academic decision of a university 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.' " *Raethz*, 346 Ill. App. 3d at 732 (quoting *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985)).

¶ 36	Urso argues that Bradley breached its contract with her by dismissing her from its nursing program. In support of this argument, Urso first contends that the evidence "unequivocal[ly]" showed that recording Phillips's 9:55 a.m. vitals for her patient at 10:16 a.m. did not constitute an "unsafe practice" within the meaning of the Nursing Handbook because the health of Urso's patient was not threatened or "compromised in any respect."

¶ 37	We conclude that we may not review this argument, as it would require this court to engage in a prohibited judicial determination of an academic decision. The Department of Nursing applied its interpretation of an "unsafe practice," as delineated in the Nursing Handbook, to Urso's acts, which occurred in a clinical learning setting. In doing so, nursing faculty determined that Urso's actions did not meet the criteria for a passing grade and, instead, warranted a failing grade of "unsatisfactory" in her clinical practicum course. We are not at liberty to second-guess how Bradley's Department of Nursing applied its grading criteria to Urso. *Frederick*, 247 Ill. App. 3d at 470. " '[C]ourts are particularly ill-equipped to evaluate academic performance.' " *Frederick*, 247 Ill. App. 3d at 470 (quoting *Board of Curators v. Horowitz*, 435 U.S. 78, 92 (1978)). We do note, however, that Urso's argument that the evidence "unequivocal[ly]" established that she did not threaten or compromise the health of the patient fails to consider that the Nursing Handbook's definition of "unsafe practice" includes acts that "ha[ve] the potential to threaten the physical, emotional, mental, or environmental safety of the client." To that point, the record shows that Bradley's nursing faculty immediately recognized that Urso's act of entering vitals at 10:16 a.m. that she did not take—and that did not reflect the patient's status at that time—was potentially harmful. Wallenfang's clinical anecdotal note for March 20, 2017, indicated that, upon learning of Urso's act, she told Urso that the patient could have been in severe hypotension at 10:16 a.m., and the vitals Urso entered would not have accurately reflected the patient's true status at that time.

Likewise, at Daniels's deposition, she explained that Urso put her patient at risk because "if that client's vital signs were not stable as they had been 40 minutes earlier, that would not have been caught and it would have looked to any other provider or healthcare worker that that client was stable, when in fact they might not have been." Thus, Urso has not established that Bradley acted so beyond accepted academic norms that it was not exercising its professional, academic judgment in deeming her act to be an unsafe practice as delineated in the Nursing Handbook. *Raethz*, 346 Ill. App. 3d at 732.

¶ 38    Accordingly, we reject Urso's request to review Bradley's academic decision to give her a failing grade in NUR 317 which, per the Nursing Handbook, resulted in her dismissal from the nursing program. See *Harris v. Adler School of Professional Psychology*, 309 Ill. App. 3d 856, 859 (1999) ("There is no judicial review of academic decisions," and there is "no justification for court intervention where a grade is dispensed by a teacher within that teacher's subjective discretion.").

¶ 39    Urso nevertheless contends that her dismissal was arbitrary, capricious, and in bad faith because Bradley breached various provisions of its Student Handbook during the Student Grievance Procedure that ultimately upheld her failing grade. Specifically, Urso complains that Dean Sattler and Interim Associate Dean Wolfe violated the Student Grievance Procedure by delivering their decision to uphold Urso's failing grade more than five working days after their meeting with Urso. Additionally, Urso complains that Provost Zakahi violated the Student Handbook by failing to state the reasons for his decision to uphold Urso's failing grade in his letter to her. Finally, Urso asserts that the hearing before the Committee should have been recorded. These arguments miss the mark.

¶ 40        We find *Raethz* instructive. In *Raethz*, the plaintiff failed to earn credit for two consecutive terms of field instruction in Aurora University's master's in social work program. *Raethz*, 346 Ill. App. 3d at 728-29. Per the university's School of Social Work Handbook, this was grounds for dismissal from the program. *Raethz*, 346 Ill. App. 3d at 729. After a review committee considered the plaintiff's situation and determined that she should be dismissed from the program, the plaintiff appealed the decision to a dean, who upheld her dismissal. *Raethz*, 346 Ill. App. 3d at 730. The plaintiff sued the university, alleging that she was wrongfully expelled from the program. *Raethz*, 346 Ill. App. 3d at 728-29. Specifically, she claimed that the university's Field Instruction Manual required that when a student's performance in field instruction was deemed unsatisfactory, a joint conference with the faculty liaison, the field instructor, and the student should be held to develop a written plan to address the unsatisfactory performance. *Raethz*, 346 Ill. App. 3d at 730. Additionally, the Field Instruction Manual required instructors to document all verbal warnings and notify the student and faculty field liaison if the student was not improving. *Raethz*, 346 Ill. App. 3d at 730. At trial, evidence was presented that the plaintiff told her faculty liaison that she needed additional supervision and instruction and that no one complained about her performance or warned her that she was in danger of failing. *Raethz*, 346 Ill. App. 3d at 730. Additionally, the evidence showed that the university did not comply with the requirement to hold a joint conference, per the Field Instruction Manual, to remediate the plaintiff's unsatisfactory performance. *Raethz*, 346 Ill. App. 3d at 730. The trial court found that the university failed to fulfill the requirements of the Field Instruction Manual and provide meaningful services to allow the plaintiff to complete the field instruction portion of the curriculum. *Raethz*, 346 Ill. App. 3d at 731. Accordingly, the court found that the university breached its agreement to deliver a degree to plaintiff if she achieved satisfactory grades. *Raethz*, 346 Ill. App. 3d at 731.

¶ 41        The appellate court reversed. *Raethz*, 346 Ill. App. 3d at 734. The court rejected the plaintiff's argument that the university's breach of the Field Instruction Manual amounted to *per se* arbitrary and capricious conduct. *Raethz*, 346 Ill. App. 3d at 733. The court explained that, if it sanctioned such an argument, "any failure by a university to comply with the terms set forth in the university's catalogs or manuals would amount to *per se* arbitrary and capricious conduct." *Raethz*, 346 Ill. App. 3d at 733. The court further noted that:

> "What would make the University liable for breach of contract in the student-university setting is not that the University exercised its academic judgment unwisely, by allegedly failing to properly comply with the Field Instruction Manual, but that it did not exercise its academic judgment at all, instead acting arbitrarily or in bad faith in its treatment of plaintiff." *Raethz*, 346 Ill. App. 3d at 733.

The court concluded that the University's "alleged violations of the Field Instruction manual [did] not amount to arbitrary, capricious, or bad faith conduct," but instead amounted to an exercise of the university's academic judgment in dismissing the plaintiff. *Raethz*, 346 Ill. App. 3d at 733-34.

¶ 42        Here, we first note that the purported breaches Urso alleges are without merit. As to her claim that the hearing before the Committee should have been recorded, she points to no provision in the Student Handbook requiring as much, nor has our review of the record revealed any such requirement. While the record does indicate that transcripts are required for hearings in the academic integrity (*i.e.*, grade tampering) grievance procedure, there is no similar requirement for proceedings pertaining to an academic grievance (*i.e.*, unfair academic evaluation by a faculty member), which is at issue here. Additionally, we note that Provost Zakahi noted in his letter informing Urso of his decision that he was "in agreement with the recommendation of the

committee" and included the Committee's letter outlining its reasoning for upholding Urso's failing grade. Finally, Urso's contention that Bradley failed to abide by certain timing requirements outlined in the Student Grievance Procedure ignores that the Student Grievance Procedure delineated those times as merely "recommended guidelines."

¶ 43　　　In any event, like in *Raethz*, we conclude that any alleged violations of the Nursing Handbook or of the Student Grievance Procedure in Bradley's Student Handbook did not amount to conduct that was arbitrary, capricious, or in bad faith. Instead, Bradley exercised its academic judgment in (1) assigning Urso a failing grade for NUR 317, (2) upholding that grade through the Student Grievance Procedure, and (3) sustaining her dismissal from the nursing program due to her two failing grades, per the Nursing Handbook's policy. The record shows that the procedure regarding Urso's grievance was well documented and that faculty and the Committee carefully considered Urso's claims. Thus, even if Bradley exercised its academic judgment unwisely by deviating from certain provisions of the Student Grievance Procedure, Urso's contention fails because Bradley nevertheless exercised its academic judgment. *Raethz*, 346 Ill. App. 3d at 733-34.

¶ 44　　　Finally, Urso argues that her dismissal from the nursing program was the result of an arbitrary and capricious decision by Bradley, in that the decision was motivated by animus by faculty members who could have opted for a less severe penalty. Specifically, Urso argues that Wallenfang "did not have a high regard" of Urso, "thought that [Urso] was a liar," was "not happy" about comments Urso had made about Bradley, and attempted to make Urso sign her final evaluation, which she claims would have amounted to "admitting guilt." These arguments are unpersuasive. The record does not support Urso's claim that Bradley faculty treated her in any manner that was arbitrary, capricious, or in bad faith. As to Urso's claim that Wallenfang attempted

to have her admit "guilt," by signing her evaluation, Dr. Flannigan testified that she and Wallenfang only sought Urso's signature to indicate that Urso had read the evaluation. Further, the record does not support Urso's claim that Wallenfang or any other faculty member was motivated by animus in recommending a failing grade. Indeed, at Wallenfang's deposition, Wallenfang testified that she had "no problems with [Urso]." While Wallenfang noted at her deposition that she thought Urso had lied, she explained that this was because Urso had sent an e-mail claiming that Wallenfang's "accusations have no merit" and that "absolutely no falsification of records occurred," in direct contradiction to Urso's prior statement to Wallenfang, in which she "admitted to me that she did not take the patient's vital signs" that were entered at 10:16 a.m. Thus, Wallenfang's determination that Urso had lied did not occur until *after* she had already assigned a failing grade to Urso for engaging in an unsafe practice.

¶ 45          As such, the record does not establish that Bradley faculty was motivated by animus in giving Urso a failing grade and removing her from the nursing program. To the contrary, plaintiff took full advantage of Bradley's comprehensive Student Grievance Procedure. Accepting Urso's argument that her removal was arbitrary, capricious, and in bad faith "would necessarily lead one to reach a conclusion that there was a conspiracy to fail the plaintiff by each and every professor who evaluated her academic performance." *Seitz-Partridge v. Loyola University of Chicago*, 409 Ill. App. 3d 76, 85-86 (2011). The record does not support this. Instead, the record shows that Bradley carefully documented and considered Urso's claims before finally upholding her failing grade and dismissing her from the nursing program, per the Nursing Handbook. The record indicates that this decision was consistent with prior instances when students in the nursing program had falsified documents. While the record does suggest that exceptions had been made to

the Department of Nursing's policy of prohibiting students from continuing in the program after two failing grades, those situations involved extenuating circumstances that were not present here.

¶ 46    " 'Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.' " *Frederick*, 247 Ill. App. 3d at 469 (quoting *Horowitz*, 435 U.S. at 90). Here, the record establishes that Urso's failing grade and subsequent dismissal from Bradley's nursing program was the result of an academic judgment exercised by Bradley. That academic decision is not subject to judicial review. Accordingly, the trial court properly denied Urso's motion for summary judgment and granted Bradley's motion for summary judgment.

¶ 47                                III. CONCLUSION

¶ 48    For the reasons stated, we affirm the trial court's judgment.

¶ 49    Affirmed.

*Urso v. Bradley University*, **2023 IL App (4th) 230165**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 18-L-116; the Hon. Frank W. Ierulli, Judge, presiding. |
| **Attorneys for Appellant:** | Joel F. Handler, of Chicago, for appellant. |
| **Attorneys for Appellee:** | William R. Kohlhase, of Miller, Hall & Triggs, LLC, of Peoria, for appellee. |