NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 4240674-U

NO. 4-24-0674

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 31, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE CITY OF SPRINGFIELD, ILLINOIS, a Municipal Corporation, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Sangamon County |
| v. | ) | No. 23MR237 |
| METROPOLITAN COMMERICAL BANK; OLDE TOWN APARTMENTS OWNER LLC; UNITED RENTALS (NORTH AMERICA), INC.; AIRTECH HVAC/R LLC; ANGELES PAINTING AND REMODELING; BLEDSOE ELECTRIC, INC.; HD SUPPLY FACILITIES MAINTENANCE; and R.P. LUMBER CO., | ) ) ) ) ) ) ) | |
| Defendants | ) | Honorable Christopher G. Perrin, |
| (Metropolitan Commercial Bank, Defendant-Appellant). | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Doherty and Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed in part and reversed in part the trial court's order of demolition granting summary judgment in favor of the City of Springfield where (1) the court correctly found that no genuine issue of material fact existed as to the alleged buildings' danger and safety, (2) the court incorrectly found that there was no genuine issue of material fact related to the feasibility of repairs of the alleged buildings where the parties presented different valuations and facts on the matter, and (3) the notice issued upon Metropolitan Commercial Bank was not so deficient as to prejudice it in the proceedings.

¶ 2   This case arises out of a complaint for the demolition of five buildings in the Olde

Town Apartments complex (Complex) filed by plaintiff, the City of Springfield (City).

Defendant, Metropolitan Commercial Bank (Metropolitan), holds a lien on the Complex. Upon

hearing the City's motion for summary judgment, the trial court entered an order granting demolition. Metropolitan now appeals that order, arguing that the motion for summary judgment was premature and that there are genuine issues of material fact that should have precluded the court from granting the motion. Metropolitan also argues the notice served upon it was insufficient.

¶ 3            For the following reasons, we affirm in part and reverse in part the ruling of the trial court. We hold there was not a genuine issue of material fact as to the danger and safety of the buildings, but that there was a genuine issue of material fact as to the feasibility of repairs. We also hold that the notice issued upon Metropolitan, while improper, was not so deficient as to warrant reversal.

¶ 4                                    I. BACKGROUND

¶ 5            In July 2023, the City filed a complaint for demolition, seeking to demolish five buildings in the Complex located in Springfield, Illinois, alleging the buildings were dangerous and beyond reasonable and economically feasible repair. The Complex consists of 24 buildings over 11.6 acres, including 23 apartment buildings and 1 clubhouse. Specifically, the City sought to demolish buildings 702, 708, 718, 720, and 730. The complaint for demolition identified Olde Town Apartments Owner LLC as the fee simple title holder of record and Metropolitan as a lienholder of record.

¶ 6            The City's complaint alleged that on or about March 13, 2023, Mitchell Flynn, the City's building inspector, examined the premises. As a result of this inspection, the City identified various defects and issues with the buildings. The complaint alleged building 702 contained various structural issues, including decay and deterioration, standing water in the crawl space, mold, a missing subfloor, and a failing foundation. Building 708 had various structural

issues, including decay and deterioration, standing water in the crawl space, mold, a soft and uneven subfloor, and missing siding, soffit, and fascia. Building 718 had mud and water washing into the ground level, standing water in the crawl space, mold, broken windows, and a bad foundation. Building 720 had an exterior wall being pushed in and mud washing through the exterior wall inside. Building 730 had missing doors, windows, siding, soffit, fascia and wall sheathing, and deteriorating floor joists, subflooring, and wall framing.

¶ 7        The complaint also alleged that on April 10, 2023, notice to repair or demolish the buildings at 700 Bruns Lane, Springfield, Illinois, was sent to defendant Olde Town Apartments Owner, LLC, by regular, first-class mail. A copy of the notice was attached to the complaint and showed that a separate notice was given for each individual building and its address. Additionally, the complaint alleged that on July 5, 2023, notice to repair or demolish the buildings located at 700 Bruns Lane, Springfield, Illinois, was also sent to Metropolitan. An attached copy of this notice contained a notice only for the address "700 Bruns Lane, Springfield, Illinois 62707," and it did not identify any individual buildings. Metropolitan received a copy of the complaint on or about August 24, 2023.

¶ 8        Then, the City filed a motion for summary judgment, together with the supporting affidavit of Mitchell Flynn.

¶ 9                        A. Flynn's Affidavit

¶ 10        In his affidavit, Flynn stated he was the building inspector for the City and had held that position since November 2021. Prior to that, starting in 2003, Flynn served as a building inspector for the City of Macomb, Illinois. Before that employment, Flynn stated he was a carpenter. Since 2003, Flynn stated he has been a certified residential inspector, and since 2022, he has been a certified building inspector.

¶ 11    Flynn also attested to conducting the inspection of the Complex on March 13, 2023. He recalled finding five buildings to be in dangerous and unsafe condition and listed the reasons that were alleged in the complaint detailed above. Flynn stated he conducted a second inspection of the Complex on November 16, 2023, and found the conditions remained.

¶ 12    Moreover, Flynn stated that, based on his training and experience, he estimated the repair costs of the five buildings to total $2,665,000. He detailed the repairs per building as follows: building 702—$625,000; building 708—$625,000; building 718—$425,000; building 720—$460,000; and building 730—$530,000. Flynn's affidavit also included a true and accurate copy of the Assessment Calculation Report obtained from the Capital Township Assessor's Office in Sangamon County. This assessment showed the fair market value of the entire Complex to be $4,504,451. The total fair market value of the buildings plus the land was calculated to be $5,276,886. The Assessment Calculation Report also provided a fair market value of each apartment building based on the number of units as follows: buildings with 18 units were assessed at $301,450 each; those with 12 units were assessed from $243,234 to $252,963 each. Ultimately, the affidavit concluded that the fair market value of the five buildings set for demolition was between approximately $1,274,386 and $1,313,302. Attached to the affidavit were pictures of the buildings, accompanied by e-mails written by Flynn stating the cost of repairs for each building.

¶ 13                    B. Metropolitan's Response

¶ 14    Metropolitan filed an opposition to the City's motion for summary judgment. Attached to the opposition were the affidavits of John Mackris and James Napoli.

¶ 15                    1. *John Mackris's Affidavit*

¶ 16    In his affidavit, Mackris stated he was currently the senior managing director for

Newmark Valuation & Advisory (Newmark) and the "Market Leader" for several states, including Illinois. He also stated he had experience performing valuations and market analyses on a broad range of properties, including apartment complexes, large mixed-use developments, and vacant lots. He recounted that in his career, he had completed valuations and market studies on proposed, partially completed, renovated, and existing properties for a variety of reasons, including mortgage financing, potential sales and purchases, and feasibility. Mackris attested that prior to joining Newmark in 2017, he worked for over 19 years in the Chicago office of Cushman & Wakefield as an executive director and co-leader of the Midwest retail specialty practice. Before that position, Mackris was a senior appraiser for Terzo & Bologna, Inc., in Southeast Michigan. He also has a degree in economics from the University of Michigan, Ann Arbor, is a certified real estate appraiser for several states, including Illinois, received an MAI designation from the Appraisal Institute, is a member of the Royal Institution of Chartered Surveyors, and is a "Certified Commercial Investment Member."

¶ 17　　　　Mackris attested to his appraisal of the Complex. In his appraisal, he analyzed the fair market value of the Complex "as is" and after completion of the planned repairs. He assured that his analysis "complied with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practices." In his appraisal, Mackris concluded that the "as is" fair market value of the Complex is $10,000,000, and the fair market value after repairs is $18,200,000. In his appraisal, Mackris examined and analyzed the land and buildings, the zoning and legal restrictions, the cost of repairs and improvements, and real estate taxes, and outlined two methodologies employed to find the fair market value: the sales comparison approach and the income capitalization approach. The appraisal also contained detailed calculations for these methods, as well as the insurable replacement costs and insurable

value of the Complex. In totality, Mackris's appraisal analysis is over 90 pages.

¶ 18                                   2. *James Napoli's Affidavit*

¶ 19        Napoli's affidavit was provided to critique Flynn's affidavit. Napoli stated he is currently an account manager for Nova Group, GBC, and is a licensed professional engineer in New York, New Jersey, Connecticut, Pennsylvania, Florida, and Louisiana. Napoli stated he has over 10 years of property condition assessment experience and has assessed site improvements, buildings, roofing systems, mechanical systems, electrical systems, and plumbing systems. Napoli also has training regarding building and material costs and regularly provides estimates and reports on maintaining a variety of properties.

¶ 20        In his affidavit, Napoli attested that he reviewed Flynn's affidavit and all the relevant photographs, notes, and records with another Nova Group, GBC, professional associate who performed a site visit at the Complex on January 12, 2024. Based upon his professional and educational experience, Napoli asserted the opinion provided by Flynn "does not appear to be a traditional cost estimate completed by a Professional Engineer." Napoli opined that because Flynn's valuations were not supported by details, it was unclear how the valuations were calculated. According to Napoli, "Critical information regarding the costs and scope of repair is missing from Mr. Flynn's affidavit which is necessary in determining the accuracy of his estimates." Napoli noted Flynn did not provide any information regarding his qualifications and experience relating to cost estimates.

¶ 21                                   C. The Trial Court's Ruling

¶ 22        After reviewing the motion, the response, and the affidavits, the trial court granted the City's petition for demolition. The court found the defendants, including Metropolitan, were properly served in a manner prescribed by law. The court also found the pleadings, affidavits,

and exhibits established there was no genuine issue of material fact that the five buildings in question were unsafe and dangerous. Furthermore, the court found no genuine issue of material fact that the buildings were beyond reasonable repair and that such repairs were not feasible.

¶ 23　　　　Specifically, the trial court found Flynn's affidavit established that the cost to repair the buildings was approximately $2,665,000, and that Napoli's affidavit did not create a genuine issue of material fact, as it lacked facts and evidence to suggest an alternative cost of repair. The court found that the Newmark appraisal attached to Mackris's affidavit, which concluded that the current fair market value of the whole Complex was $10,000,000, failed to create a genuine issue of material fact. Instead, the court found the Capital Township Assessment's valuation of $5,276,886 and the arm's length sale by national auction in November 2022 in the amount of $5,250,000 established the fair market value of the Complex. The court ruled that "regardless of the different valuations presented, there is still no genuine issue of material fact that the owner of the Buildings, Defendant Olde Town Apartments Owner LLC, was given a reasonable opportunity (over 3 years) to repair the Buildings and has failed to do so."

¶ 24　　　　The trial court then granted the City's motion for summary judgment and ordered demolition 30 days following entry of the court's order. Thereafter, Metropolitan filed a notice of appeal and a motion to stay enforcement of the court's order. The court granted the motion for stay pending resolution of this appeal.

¶ 25　　　　　　　　　　　　II. ANALYSIS

¶ 26　　　　On appeal, Metropolitan contends the City failed to show there was no genuine issue of material fact. Metropolitan argues Flynn's affidavit, which served as the entire basis of the trial court's ruling, is flawed because the affidavit does not establish (1) that Flynn was

qualified to testify to such matters and (2) the methodology by which Flynn arrived at his valuations.

¶ 27    Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, ¶ 48. "When ruling on a motion for summary judgment, a court must consider the pleadings, depositions, and affidavits strictly against the movant and in favor of the nonmoving party." *Urso v. Bradley University*, 2023 IL App (4th) 230165, ¶ 33. Furthermore, the purpose of summary judgment is not to try a question of fact, but to determine whether one exists that would preclude judgment as a matter of law. *Id.* "Accordingly, a nonmoving party need not prove his or her case in response to a motion for summary judgment but must present a factual basis that would arguably entitle that party to judgment." *Id.* "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 15. The standard of review for summary judgment rulings is *de novo*. *Id.* The burden of proof and the initial burden of production in a motion for summary judgment is on the moving party. *Evans v. Brown*, 399 Ill. App. 3d 238, 243 (2010). Here, the City is the movant, and therefore, the evidence is viewed strictly against the City and liberally in favor of Metropolitan, and the burden is on the City.

¶ 28    Pursuant to the Illinois Municipal Code, "corporate authorities of each

municipality may demolish, repair, or enclose or cause the demolition, repair, or enclosure of dangerous and unsafe buildings *** within the territory of the municipality." 65 ILCS 5/11-31-1(a) (West 2022). To do so,

> "corporate authorities shall apply to the circuit court of the county in which the building is located (i) for an order authorizing action to be taken with respect to a building if the owner or owners of the building, including the lien holders of record, after at least 15 days' written notice by mail so to do, have failed to put the building in a safe condition or to demolish it or (ii) for an order requiring the owner or owners of record to demolish, repair, or enclose the building or to remove garbage, debris, and other hazardous, noxious, or unhealthy substances or materials from the building." *Id.*

¶ 29      For a court to order demolition, two findings must be made: (1) that the building is dangerous and unsafe and (2) "the building is beyond reasonable repair." *Village of Lake Villa v. Stokovich*, 211 Ill. 2d 106, 131 (2004) (citing *City of Aurora v. Meyer*, 38 Ill. 2d 131, 137 (1967)). We address each in turn.

¶ 30                                A. Danger and Safety

¶ 31      Metropolitan argues the City failed to meet its burden of proof regarding the danger and safety of the buildings. It asserts the City failed to provide facts to support its allegations, and instead, merely made conclusory statements. Metropolitan also argues that due to the early stage of the litigation, discovery has not commenced, and therefore, resolution of this issue is not yet possible. The City asserts the buildings' condition is supported by photographic evidence attached to Flynn's affidavit and that the buildings' condition is undisputed by Metropolitan, as it has not argued or attempted to refute the condition. In its reply brief,

Metropolitan reiterates its arguments that Flynn is unqualified to offer testimony on the buildings' condition and that his affidavit merely contains conclusory statements.

¶ 32        As the movant, the City bears the burden of proving the buildings were dangerous and unsafe. Therefore, we begin our analysis with the evidence offered by the City: Flynn's affidavit.

¶ 33        1. *Compliance with Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013)*

¶ 34        Pursuant to Rule 191(a)):

> "Affidavits in support of and in opposition to a motion for summary judgment under section 2-1005 of the Code of Civil Procedure, *** shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013).

Furthermore, the "requirements of Rule 191(a) are based on the recognition that '[a]n affidavit submitted in the summary judgment context serves as a substitute for testimony at trial.' " *Essig v. Advocate BroMenn Medical Center*, 2015 IL App (4th) 140546, ¶ 46 (quoting *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002)).

¶ 35        We find Flynn is able to offer testimony regarding the condition of the buildings based on his personal knowledge. Rule 191(a) requires affiants to make statements based on personal knowledge. Flynn is the City's building inspector and has held that position since November 2021, and he was the person to inspect the Complex on March 13, 2023. "The rule is

satisfied if from the document as a whole it appears that the affidavit is based upon the personal knowledge of the affiant and there is a reasonable inference that the affiant could competently testify to its contents at trial." *Burks Drywall, Inc. v. Washington Bank & Trust Co.*, 110 Ill. App. 3d 569, 576 (1982). It is quite clear that, relating to the dangerousness and safety of the buildings, Flynn's affidavit contains statements based on his personal knowledge obtained while inspecting the buildings, as required by Rule 191(a). As such, these portions of his affidavit are allowed.

¶ 36　　　　　Metropolitan asserts Flynn is unqualified to give testimony regarding the dangerousness and safety of the buildings. In its opening brief, Metropolitan seems to argue that both prongs of the demolition test require expert testimony. Case law informs us this argument lacks merit, and both parties ultimately admit that expert testimony is not necessary. In considering orders of demolition, trial courts routinely hear testimony from relevant city employees, such as building inspectors. See *City of Aurora*, 38 Ill. 2d at 134-35 (trial court heard the testimony of the building inspector who conducted an inspection of the property in question); *Village. of Lake Villa v. Stokovich*, 334 Ill. App. 3d 488, 491-94 (2002), *rev'd,* 211 Ill. 2d 106 (2004) (at trial, court heard testimony from the city sanitarian, chief building inspector, plumbing inspector, and structural inspector); *City of Alton v. Carroll*, 109 Ill. App. 3d 156 (1982) (at trial, court heard testimony from the director of Building, Housing and Zoning for the city).

¶ 37　　　　　However, even if expert testimony was required, we find that Flynn would be qualified to testify as to the buildings' condition. Flynn has been the City's building inspector since 2021, and before that, he was the building inspector for another Illinois municipality. He also worked as a carpenter, and since 2022, he has been a certified building inspector, and since 2003, he has been a certified residential inspector.

¶ 38    Therefore, based on Flynn's general professional knowledge, as well as his personal review of the buildings, we find Flynn's affidavit appropriate for consideration in the danger and safety analysis.

¶ 39    2. *Flynn's Affidavit Regarding Dangerousness and Safety*

¶ 40    Metropolitan argues Flynn's affidavit only offers conclusory statements regarding the condition of the buildings. We disagree. In his affidavit, Flynn lists various factual reasons for why each building is dangerous and unsafe, citing issues like standing water, deterioration, mold, an uneven subfloor, and missing siding. He details the specific issues of each building, some of which are the same and some of which are not. He does not make general, blanket statements that the Complex is unsafe.

¶ 41    Metropolitan has not refuted the alleged deficiencies Flynn provides or argued his pictures attached to his affidavit were inaccurate. Nor has Metropolitan provided rebuttal evidence. Thus, we find that by producing Flynn's affidavit, the City met its burden regarding the danger and safety of the buildings. As such, we hold the trial court correctly granted summary judgment as to the danger and safety prong of the demolition test, as nothing in the affidavits provided by Metropolitan creates a genuine issue of material fact on this issue. Even viewing the evidence in the light most favorable to Metropolitan, it is unlikely a fact finder would reach a different conclusion.

¶ 42    B. Feasibility of Repairs

¶ 43    The second prong of the test requires the trial court to determine the feasibility of repairs. *City of Aurora*, 38 Ill. 2d at 136. The court must determine whether "the state of deterioration is such that repairs would amount to a substantial reconstruction." *Id.* If the court finds the defects may readily be remedied, "demolition should not be ordered without giving the

owners a reasonable opportunity to make the repairs." *Id.* at 137. However, if the building is "beyond reasonable repair," the court may authorize "the extreme remedy of demolition." *Id.* Repair of the buildings only needs to be *feasible*, and demolition is only justified "if repair makes so little economic sense that it is unlikely that an owner would make use of any further opportunity to repair." *Stokovich*, 211 Ill. 2d at 131. Whether a building is beyond reasonable repair must be based on a comparison of the cost of repair with the value of the building. *Id.*

¶ 44 Metropolitan argues the City failed to meet its burden because Flynn was unqualified to offer his affidavit on the matter, and even if Flynn could speak to the feasibility of repairs, his valuations cannot be relied upon because they are improper evidence. For the following reasons, we hold there is a genuine issue of material fact regarding the feasibility of repairs.

¶ 45 In his affidavit, Flynn states his valuations are derived from the Sangamon County Assessment Calculation Report. Metropolitan correctly points out that Flynn's affidavit fails to explain how the report is an accurate valuation of the buildings' fair market value. Moreover, Flynn cannot opine on the report's methodology, as the affidavit fails to show that Flynn was the one who prepared the report. Actually, nothing in the record demonstrates Flynn participated in creating the report or knows how it was prepared.

¶ 46 There are more issues with dependence on the report. The report states the value of the buildings is based on the number of units. But, for buildings with 12 units, it gives a range of values. Based on this, Flynn concludes that the fair market value of the buildings is in a range of approximately $1,274,386 to $1,313,302. However, Flynn does not provide an explanation as to how he reached this range or how each building is valued individually. The City asks us to infer that the values established in the report are based upon an arm's length transaction that

occurred in November 2020. Still, this is not included in the report, nor is it included in Flynn's affidavit.

¶ 47　　　　Setting aside the Assessment Calculation Report, the sale alone may provide some evidence of the fair market value of the entire property. Courts have relied on prior sales to find a property's fair market value in demolition cases. In *City of Granite City v. House of Prayer, Inc.*, 333 Ill. App. 3d 452, 457 (2002), the trial court relied on a prior sale of the property in question that took place approximately four years before the hearing. On the other hand, in *Stokovich*, the court rejected the usefulness of a prior sale when it occurred 20 years prior to the hearing. *Stokovich*, 211 Ill. 2d at 132. Here, the sale is from 2020, approximately four years prior to the hearing. Based on the record, the entire Complex sold in 2020 for $5,250,000. The Assessment Calculation Report (allegedly based in part on the 2020 sale) calculated the fair market value of the entire Complex to be $5,276,886, showing a minor increase in value over four years. Metropolitan argues this valuation is not useful due to the sale occurring during the COVID-19 pandemic.

¶ 48　　　　As to the feasibility of repairs, Flynn estimates the total cost of repairs to be $2,665,000, broken down as follows: building 702—$625,000; building 708—625,000; building 718—425,000; building 720—460,000; and building 730—530,000. Flynn provides no explanation in his affidavit for these numbers. At most, there are e-mails attached to his affidavit where he concludes the cost of repairs for each building but again provides no calculation or methodology explaining how he arrived at the numbers. They are simply conclusory statements.

¶ 49　　　　The City does not include a potential valuation after repairs are done to the buildings. So, in summary, the City provided evidence stating the fair market value of the buildings was in a range of approximately $1,274,386 to $1,313,302, and repairs equated to

$2,665,000. Thus, from the City's point of view, as the repairs are approximately double the fair market value of the buildings, repair is infeasible.

¶ 50        On the other hand, Metropolitan offered two affidavits to counter Flynn's affidavit. We will not consider Napoli's affidavit at this time, as it is mostly argumentative and critical of Flynn's affidavit and offers no insights as to the values of the buildings or the repairs. In Mackris's affidavit, Mackris's calculations are from the Newmark appraisal, which he conducted with his colleagues. Based on his appraisal, the value of the entire Complex is $10 million. He estimates the cost of repairs to be $7,991,750, of which he states $2,615,750 has been spent to date. He estimates the value of the Complex after repairs will be $18.2 million. Therefore, according to Metropolitan, the cost of repairs would equal less than half of the total projected cost, but it would be almost 80% of the total current value.

¶ 51        The facts and arguments outlined above are themselves indicative of a factual disagreement between the parties. Considering all of this, it is obvious there is a genuine issue of material fact as to the feasibility of repairs. As stated earlier, demolition is an extreme remedy. *City of Aurora*, 38 Ill. 2d at 137. Pairing that with the fact that summary judgment itself "is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt" (*Schweihs*, 2016 IL 120041, ¶ 48), we find the record before us is not free and clear from doubt as to the feasibility of repairs. The difference between the two parties' valuations of the property is quite distant, as is the cost of repairs and the potential future value.

¶ 52        Here, the trial court essentially tried the facts of the case instead of determining whether a triable issue of fact *existed*. It is apparent from the record before us that the trial court and the parties could have benefited from discovery, a hearing, or a trial to determine actual

values and costs. We do not offer an opinion as to which valuation is correct or whether repairs are feasible at all; we simply find there is a triable issue of fact.

¶ 53       The City argues that Metropolitan has been given an opportunity to repair the buildings and has failed to do so, and as such, we should affirm the trial court's order. This argument is premised on the City's prior administrative action brought against Olde Town Apartments Owner, LLC, for building code violations. However, this action was not against Metropolitan, and there is no evidence that Metropolitan was an active participant in that proceeding.

¶ 54       We note that those with a legal interest in a property have "a reasonable opportunity to make the repairs." *City of Aurora*, 38 Ill. 2d at 137. We do not opine on what is a reasonable opportunity, nor whether the facts of this case demonstrate whether defendants have been given a reasonable opportunity. We merely point out that this is another question in the case which cannot be decided on summary judgment.

¶ 55       Lastly, the City points out that Metropolitan intends to sell the Complex, as the owner has defaulted on its payments to Metropolitan. This is based on the affidavit of Vivek Baid, the vice president of Metropolitan, attached to Metropolitan's response to the City's motion for summary judgment. The City argues that, because Metropolitan intends to sell the Complex in satisfaction of its lien, somehow this should lead us to affirm the trial court. This argument makes little sense, as whether Metropolitan seeks to call due its loan has no relevance as to the feasibility of repairs.

¶ 56                                    C. Notice

¶ 57       Finally, we address Metropolitan's argument regarding the notice in this case. The Illinois Municipal Code mandates that a municipality can only seek a demolition order "after at

least 15 days' written notice by mail" to the owner and lienholders of the record to repair or demolish the building. 65 ILCS 5/11-31-1(a) (West 2022). Further supporting this argument is Springfield Code of Ordinances § 170.16.15(d)(2) (eff. Jan. 11, 2023), which states that the City must send a "notice to repair or demolish" to "any party of record appearing to have an interest" in the building at issue and must allow "15 days for the repair or demolition of the building or buildings."

> "The notice provision of section 11-31-1 serves not only the purpose of helping to facilitate remediation of dangerous structures, but also that of codifying the right to notice (and the right to be heard) afforded by procedural due process to a lienholder whose lien may become subordinate, or severely diminished, when a court orders that the building securing the lien be demolished." *Village of Ringwood v. Foster*, 405 Ill. App. 3d 61, 85 (2010), *as modified on denial of reh'g* (July 13, 2010).

"While section 11-31-1 does not prescribe the form of notice required in a proceeding of this nature, the purpose of such notice is to give the owner the choice of demolishing the structure or putting it in safe condition." *City of Alton v. Carroll*, 109 Ill. App. 3d 156, 163 (1982).

¶ 58        The notice attached to the City's complaint is dated July 5, 2023. The complaint was filed on July 21, 2023. Therefore, the complaint was timely filed, but, in its answer, Metropolitan denied ever receiving that notice. Metropolitan also argues the notice sent to it was defective because it did not set forth the correct address for the specific buildings in question. This is contrasted with the notices sent to the owner of the buildings, where a single notice was sent for each building individually. Nothing in the record explains why the notices were sent this

way. Metropolitan was later served a summons along with the complaint. Metropolitan then filed an answer and has since been an active participant in the litigation.

¶ 59 We agree that the notice originally provided to Metropolitan is on its face deficient. The purpose of the notice is to provide those with an interest in the property with an opportunity to repair the property before a municipality proceeds with demolition proceedings. Here, the notice sent to Metropolitan included only the address of the entire Complex, leaving Metropolitan to wonder whether the entire Complex would be demolished, or to figure out on its own which buildings the City was singling out. However, we find that, in light of our decision to remand the case for further proceedings, and considering Metropolitan's participation in the litigation, the deficiency is not so severe as to dissolve the proceedings altogether.

¶ 60 Both parties cite *Foster* in support of their arguments. In *Foster*, a lienholder was not originally given proper notice of a complaint for demolition, and, on appeal, the Second District vacated the demolition order so that the lienholders could properly receive notice and an opportunity to contest the complaint for demolition. *Foster*, 2013 IL App (2d) 111221, ¶ 45. The court stated, "We protected First National's due process rights by vacating the demolition order and ensuring that First National was provided an opportunity to participate in the demolition suit." *Id.*

¶ 61 Here, resetting the case to provide Metropolitan with notice would do little for the progress of the litigation. We are vacating part of the trial court's grant of summary judgment and vacating the order for demolition. Metropolitan is exercising its right and opportunity to oppose the complaint. Moreover, even if we were to reverse on the basis of notice alone, due to the scope of the repairs needed, Metropolitan would not be able to repair the buildings within 15 days, and the litigation would return to the stage we are at now. The record shows that, to date, at

least some repairs have been made, and as a result of participating in the litigation, Metropolitan is now on notice as to which buildings are the subject of the complaint.

¶ 62                                III. CONCLUSION

¶ 63         For the reasons stated, we affirm the trial court's ruling that the buildings are in a dangerous and unsafe condition. On the issue of the feasibility of repairs, we hold there was a genuine issue of material fact and reverse and vacate. We also vacate the remainder of the trial court's order for demolition. We remand for further proceedings consistent with this order.

¶ 64         Affirmed in part and reversed in part; cause remanded.